UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| JAMES MONTGOMERY, ) | |
| ) | |
| Plaintiff, ) | Civil No. 08-312-ART |
| ) | |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | **MEMORANDUM OPINION AND** |
| Commissioner of Social Security, ) | **ORDER** |
| ) | |
| Defendant. ) | |
| ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Before the Court are the cross-motions for summary judgment filed by Plaintiff James Montgomery, R. 10, and Defendant Michael J. Astrue, Commissioner of Social Security, R. 11. Because the denial of Montgomery's application for supplemental security income benefits is supported by substantial evidence, the Court will deny Montgomery's motion for summary judgment and grant the defendant's motion for summary judgment.

**I. Background**

Montgomery filed an application for supplemental security income benefits on January 17, 2006, Adm. R. at 45, alleging a disability beginning on December 7, 2005, *id.* This claim was denied initially on May 18, 2006, *id.* at 26, and it was denied upon reconsideration on August 8, 2006, *id.* at 31. Montgomery thereafter requested and was granted a hearing, which was held on August 23, 2007 in Lexington, Kentucky. *Id.* at 398. Following the hearing, the administrative law judge ("ALJ") issued an opinion that again denied Montgomery's claim for benefits. *Id.* at 14-22.

Montgomery is a forty-eight year old man who, in the past, has performed construction jobs

such as hanging drywall. *See id.* at 45, 113. He has not worked since 2003 though. *Id.* at 60. He claims that he has been disabled since December 7, 2005 due to degenerative disc disease of the cervical spine, intellectual functioning problems, degenerative disc disease of the lumbar spine with chronic pain, and bilateral shoulder pain. R. 10, Mem. at 1-2. He also asserts that he suffers from hypertension, early obstructive pulmonary disease, and a bony deformity of the dorsum of the right hand. *Id.* at 2.

On February 21, 2006, Dr. Stephen Nutter performed a consultative physical examination of Montgomery. *See* Adm. R. at 107-11. This examination led Dr. Nutter to opine that Montgomery's "ability to perform work-related activities such as bending, stooping, lifting, walking, crawling, carrying and traveling as well as pushing and pulling heavy objects appears to be at least moderately impaired due to back pain and joint pain . . ." *Id.* at 110-11. Dr. Nutter further concluded that Montgomery "should avoid squatting and climbing ladders or scaffolding." *Id.* at 111.

Following Dr. Nutter's physical examination, Dr. Crystal Sahner performed a consultative psychological examination on April 5, 2006. *See id.* at 112-18. Although Dr. Sahner found that Montgomery has a full-scale IQ score of 74, which is on the borderline range of functioning, *see id.* at 116, she also found that he has adequate ability to: (1) understand, remember, and carry out instructions toward the performance of simple, repetitive tasks; (2) interact appropriately with fellow workers and supervisors in a workplace setting; (3) tolerate the stress and pressure of day-to-day employment in a workplace setting; and (4) sustain attention and concentration toward the performance of simple, repetitive tasks. *Id.* at 117-18. Overall, Dr. Sahner concluded that Montgomery's "cognitive problems are likely to be enduring," but his "prognosis in regards to mental health is good, as he does not have a mental health diagnosis." *Id.* at 118.

Also on April 5, 2006, Dr. Jorge Baez-Garcia performed a physical residual functional capacity assessment. *See id.* at 119-26. He concluded that Montgomery could work with the following limitations: (1) occasionally lifting and/or carrying up to 50 pounds; (2) frequently lifting and/or carrying up to 25 pounds; (3) sitting, standing, and/or walking for up to six hours (with normal breaks) in an eight-hour workday; and (4) avoiding concentrated exposure to vibration. *Id.* at 120, 123. Dr. Baez-Garcia also found that Montgomery could perform jobs that required frequent stooping, kneeling, and crouching, although he could not perform jobs that required him to crawl more than occasionally, or that required more than occasionally climbing ramps, stairs, ladders, ropes, and scaffolds. *See id.* at 121. A second physical residual functional capacity assessment performed by Dr. Timothy Gregg on August 4, 2006, fully concurred in Dr. Baez-Garcia's conclusions. *See id.* at 192-99.

Dr. Edward Stodola conducted a mental residual functional capacity assessment on April 26, 2006. *See id.* at 128-30. Although he found Montgomery to be moderately limited in certain aspects of cognitive and functional skills—to wit, understanding and memory, sustained concentration and persistence, social interaction, and adaptation—he nevertheless concluded that Montgomery is mentally able to: (1) understand, remember, and carry out simple instructions for two-hour segments over an eight-hour workday, five days per week; (2) relate adequately in object-focused settings; (3) and adapt to the changes and pressures of a routine setting. *See id.* A second mental residual functional capacity assessment performed by Dr. Ilze Sillers on July 31, 2006 fully concurred in Dr. Stodola's conclusions. *See id.* at 175.

In July of 2006, Montgomery complained to his primary care provider at Berea Health Ministry that he was suffering from back pain, an inability to stand for long periods of time, and an inability to

grip with his hands. *See id.* at 208-09. However, radiological examinations of the lumbar spine revealed no fractures, normal alignment, and no significant degenerative change, *see id.* at 168, and a radiological examination of the thoracic spine revealed no fractures, normal alignment, well-maintained disc heights, and no acute abnormalities, *see id.* at 169. An MRI of the lumbar spine was performed a short time later, on August 16, 2006, and it revealed a bulging disc in the L3-4 disc space, a bulging and herniated disc in the L4-5 disc space, and a bulging and herniated disc with an annular tear in the L5-S1 disc space. *See id.* at 160. Additional MRI's were taken of the cervical spine and thoracic spine on November 8, 2006. *See id.* at 214-16. The cervical spine MRI showed mild disc protrusion and "multilevel significant discogenic degenerative changes," *id.* at 214-15, while the thoracic spine MRI was "unremarkable" and showed "[n]o areas of disc bulging or protrusion." *Id.* at 216.

On December 19, 2006, Montgomery was admitted to Marymount Medical Center in London, Kentucky, due to weakness in his left leg. *See id.* at 346. By March of 2007, Montgomery was still experiencing problems with his left leg. *See id.* at 270. Subsequent examinations revealed that he was suffering from occlusion of the iliac arteries and mild plaquing of the left superficial femoral artery. *See id.* at 267. These conditions were causing pain and limb-threatening ischemia in both lower extremities. *Id.* at 324. As a result, Dr. James Shoptaw performed a thrombectomy of the distal aorta and an aorto-bifemoral bypass on March 13, 2007. *Id.* This procedure was successful, and according to Montgomery, it relieved 90 percent of his pain. *See id.* at 437.

Montgomery had five post-surgery appointments with Dr. Shoptaw prior to the hearing with the ALJ on August 23, 2007. *See id.* at 371-75. Dr. Shoptaw's notes from these check-ups indicate that the surgery remedied Montgomery's problems with pain and numbness in his legs. *See id.* For

4

instance, Dr. Shoptaw noted on July 25, 2007 that "Patient is doing well with no leg pain," *id.* at 371, and on May 30, 2007, he noted that "Patient states that he is having no numbness in the left or right foot. He is walking daily without any pain," *id.* at 372. During the May 30 check-up, Dr. Shoptaw also filled out a "Physical Capacities Evaluation" form. *Id.* at 221. On that form, Dr. Shoptaw opined that Montgomery is only capable of sitting for one hour during an eight-hour, standing for two hours, and walking for one hour. *Id.* Additionally, Dr. Shoptaw opined that Montgomery is frequently capable of lifting and carrying up to ten pounds, but can never lift or carry anything heavier than that. *Id.* He also stated that Montgomery is capable of using his hands for repetitive action, but is not capable of using his feet for repetitive movements, such as operating foot controls. *Id.* Finally, Dr. Shoptaw also opined that Montgomery is able to occasionally bend, squat, crawl, climb, and reach above shoulder level, and that Montgomery should by mildly restricted in his exposure to dust, fumes, and gases. *Id.*

At the August 27, 2007 hearing, the ALJ asked the vocational expert about the availability of jobs in the national and regional economy for an individual who had the ability to perform light exertional work, and who had the same age, education, and past relevant work as Montgomery. *See id.* at 442-43. The vocational expert testified that an individual in that position could perform assembly, hand packing, inspection, and production labor jobs. *See id.* at 443. The vocational expert further testified that there were 14,000 assembly positions in Kentucky, 2,900 hand packing positions, 5,500 inspecting positions, and 12,000 production labor positions. *Id.* at 444.

## II. Analysis

A claimant can receive supplemental security income benefits only if he is deemed "disabled" under the Social Security Act. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001)

(citing 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A)(1988)). "A claimant qualifies as disabled if [he] cannot, in light of [his] age, education, and work experience, 'engage in any other kind of substantial gainful work which exists in the national economy.'" *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc) (quoting 42 U.S.C. § 423(d)(2)(A)).

To identify claimants who fit within this definition of disability, the Social Security Administration (SSA) uses a five-step "sequential evaluation process." 20 C.F.R. § 404.1520(a)(4); *see Combs*, 459 F.3d at 642. Step one examines the work activity of the claimant to determine whether he is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4). Step two is a determination of whether the claimant has a medically determinable "severe impairment" or combination of impairments that qualify as severe. *Id.* Step three determines whether the claimant's impairments meet the criteria set forth in the regulations to categorize an individual as "disabled." *Id*. The fourth step examines whether the claimant retains any "residual functional capacity" and whether the claimant can return to his past relevant work. *Id*. Finally, if the claimant is unable to return to any past relevant work, it must be determined whether he has the residual functioning capacity to do any other work. *Id*. The claimant bears the burden through the first four steps, but the burden shifts to the SSA at the fifth step. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003).

In this case, the ALJ performed the requisite five-step process to evaluate Montgomery's claims. First, the ALJ found that Montgomery had not engaged in substantial gainful activity since January 17, 2006, the date of his application. Adm. R. at 16. Second, the ALJ concluded that Montgomery has the following severe impairments: (1) degenerative disc disease of the cervical spinel; (2) borderline intellectual functioning; (3) alcohol dependence in full sustained remission; (4) degenerative disc disease of the lumbar spine with chronic pain; and (5) bilateral shoulder pain. *Id.*

At the third step, the ALJ determined that Montgomery does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 17. At the fourth step, the ALJ concluded that Montgomery is not capable of performing any past relevant work, and that he has the residual functional capacity to perform light exertional work with the following limitations: (1) occasionally lifting and carrying twenty pounds, and frequently ten pounds; (2) standing and walking six hours in an eight-hour day; (3) sitting six hours in an eight-hour day; (4) no more than frequently pushing and pulling with his upper and lower extremities; (5) never climbing ladders, ropes, or scaffolds, and only occasionally climbing stairs or ramps; (6) only occasionally stooping, kneeling, or crouching, and never crawling; (7) no more than frequently reaching in all directions; and (8) avoiding concentrated exposure to full body vibration.[1] *See id.* at 18-21. Based on that residual capacity and the vocational expert's testimony, the ALJ determined at the fifth step that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* at 21.

In reviewing the ALJ's decision, the Court is restricted "to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 42 U.S.C. § 405(g), and *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). Substantial evidence means "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Cutlip*, 25 F.3d at 286). In making this

---

[1] In social security parlance, "frequently" means "occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous)," Adm. R. at 119, and "occasionally" means "occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)," *id.*

determination, the Court must examine the record as a whole. *Mullen v. Bowen*, 800 F.2d 535, 545–46 (6th Cir. 1986) (en banc). If the Commissioner's decision is supported by substantial evidence, this Court must affirm that decision 'even if there is substantial evidence in the record that supports an opposite conclusion. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (quoting *Longworth v. Comm'r of Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005)). Further, when reviewing the Commissioner's decision, the Court cannot "try the case de novo, resolve conflicts in the evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)).

The record reveals that substantial evidence supports the ALJ's decision. First, the ALJ's conclusion as to Montgomery's residual functional capacity is largely consistent with the opinions given by Dr. Stephen Nutter, *see* Adm. R. at 107-11, Dr. Jorge Baez-Garcia, *id.* at 119-26, and Dr. Timothy Gregg, *id.* at 192-99. This constitutes substantial evidence because a reasonable person could view these opinions as adequate support for the ALJ's decision. *See Rogers*, 486 F.3d at 241. Perhaps more importantly, one could also find that the ALJ's residual functional capacity determination is supported by substantial evidence because it is more generous to Montgomery than the residual functional capacity assessments conducted by Drs. Baez-Garcia and Gregg. If the ALJ had made a residual functional capacity determination that was identical to the assessments of Drs. Baez-Garcia and Gregg, the Court would have to conclude that such a determination was supported by substantial evidence since the opinions of those doctors are the kinds of evidence that a reasonable person could accept as adequate support for the ALJ's decision. *See id.* at 241. Therefore, it follows *a fortiroi* that the ALJ's more generous conclusion is supported by substantial evidence. In other words, if there is substantial evidence that Montgomery could perform jobs according to the

limitations determined by Drs. Baez-Garcia and Gregg, then there is certainly substantial evidence that he could have performed jobs according to the more generous limitations determined by the ALJ. Finally, substantial evidence also supports the ALJ's conclusion with respect the availability of jobs because it is fully supported by the opinion of the vocational expert. *See* Adm. R. at 442-45. Considering that the residual functional capacity determination and the determination as to the availability of jobs are the linchpins of the ALJ's decision, the fact that those determinations are supported by substantial evidence necessarily means that the ALJ's ultimate disposition is also supported by substantial evidence. As a result, the ALJ's decision must be affirmed.

Montgomery, however, argues that substantial evidence does not support the ALJ's decision because the ALJ failed to give deference to the treating physician, i.e., Dr. Shoptaw. It is true that the ALJ stated in his opinion that he had given little weight to the residual functional capacity assessment of Dr. Shoptaw, but this is not a ground for reversal. The opinions of treating physicians are not entitled to deference if they are not supported by objective medical evidence or are inconsistent with the other substantial evidence in the record. *See Rogers*, 486 F.3d at 242 (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (citing *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003)); 20 C.F.R. § 416.927(d)(2). In this case, Dr. Shoptaw's opinion is not supported by objective medical evidence, nor is it consistent with the other substantial evidence in the record. For example, Dr. Shoptaw opined that Montgomery could never lift or carry more than ten pounds, Adm. R. at 221, but Montgomery himself testified that he could lift twenty pounds. *Id.* at 423. Moreover, Dr. Shoptaw 's opinions as to the limitations on Montgomery's ability to sit, stand, and walk are not supported by any objective medical evidence, and they are clearly contradicted by the opinions of Drs. Baez-Garcia and Gregg.

9

Furthermore, Dr. Shoptaw's own treatment notes—which state that Montgomery "is walking daily without any pain," *id.* at 372—also seem to belie his opinion that Montgomery could not walk for more than one hour in an eight-hour day. Thus, because Dr. Shoptaw's opinions conflict with other substantial evidence in the record, the ALJ was entitled to discount them.

Montgomery also argues that the ALJ failed to consider his impairments in their entirety. Although Montgomery is correct in asserting that the ALJ was required to consider the combined effect of all of his impairments, *see Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1071 (6th Cir. 1992) (citing 20 C.F.R. § 404.1523), nothing in the record indicates that the ALJ failed to comply with this rule. To the contrary, the record amply demonstrates that the ALJ did in fact consider the cumulative impact of all of Montgomery's impairments. After all, the ALJ took into account all of Montgomery's physical and mental conditions in determining Montgomery's residual functional capacity, *see* Adm. R. at 18-21, and the hypothetical that the ALJ posed to the vocational expert at the hearing incorporated all of the physical and mental conditions that figured into the ALJ's determination of Montgomery's residual functional capacity, *see id.* at 442-43. The fact that the ALJ did not reach the conclusion that Montgomery wanted does not mean that the ALJ failed to consider the collective effect of all of Montgomery's impairments.

Finally, Montgomery contends that the ALJ's decision is not supported by substantial evidence because even if he could get one of the jobs listed by the vocational expert, his conditions are such that he could not possibly maintain the job for a significant period of time. The record, however, does not support this argument. Given that the ALJ's determination as to Montgomery's residual functional capacity is supported by substantial evidence, and given that the vocational expert testified that an individual with Montgomery's residual functional capacity could perform certain jobs that exist in the

10

economy, the Court can only conclude that there is substantial evidence supporting the assumption that Montgomery could maintain one of those jobs for a significant period of time.

### III. Conclusion

For the foregoing reasons, it is **ORDERED** as follows:

(1)  The plaintiff's motion for summary judgment, R. 10, is **DENIED**.

(2)  The defendant's motion for summary judgment, R. 11, is **GRANTED**.

(3)  Judgment will be entered consistent with this Memorandum Opinion and Order.

This the 20th day of May, 2009.

Signed By:
*Amul R. Thapar* AT
United States District Judge